The trial was fundamentally unfair to Ms. Smith and the class for four reasons. There's four reasons this court should not allow the judgment to stand. First, Southwestern secured this judgment through discovery of misconduct. Second, Southwestern secured this judgment through trial misconduct. Third, Southwestern secured this judgment through the introduction of irrelevant and prejudicial evidence. And fourth, Southwestern secured this judgment through an erroneous partial summary judgment ruling that unfairly and negatively impacted the trial. And cumulatively and individually, these errors left the class without the ability to get a fair trial. And we submit the court should reverse the judgment and hold its decisions on the district court's rulings at summary judgment and abeyance pending answers from the Arkansas Supreme Court to certified questions. Turning to the first reason this court should not allow the judgment to stand, Southwestern's discovery of misconduct. Southwestern ambushed Ms. Smith at trial with the existence and content of a document, a 2005 term sheet, that was not produced in discovery and that rendered the trial fundamentally unfair. All discovery in the case proved there was no term sheet prior to 2008. Defendant's Exhibit 13, the 2005 term sheet, was not produced in discovery in this case. Specifically, SECO's corporate representative testified the first term sheet was created in 2008 and there were none prior to 2008. The document's content and existence was key evidence on a question the jury was asked to resolve, which was the reasonableness of SECO's costs considering the circumstances surrounding the dedicated agreement, which was the source of SECO's costs. And the existence and content of this term sheet that was never produced before was extensively cited by Southwestern throughout the trial as key evidence of arms-linked circumstances surrounding the dedicated agreement 45 times in witness examination and in closing. It wasn't cumulative. It was the only evidence of any rate negotiations in the 2005 time period. And the source document for SECO's costs, the dedicated agreement, it was backdated by three years. It was effective January 1, 2006, but it wasn't signed until sometime in 2009. But with testimony about the existence and content of this 2005 term sheet, Southwestern was able to provide support where none previously existed for their argument that there were no suspect circumstances surrounding the dedicated agreement. With this surprise document, Southwestern was able to argue that the dedicated agreement was negotiated at arm's length like most major projects because the rate and other key terms were agreed to in writing and put into effect from day one in a term sheet. That was in closing. And throughout the trial, there is no doubt that this had a substantial impact on the jury's consideration of that question, whether the reasonableness of SECO's costs considering the circumstances surrounding the source of SECO's costs, the dedicated agreement. And it was reversible error to allow testimony about the content and existence of this document in two cases say as much. This court's decision in Tinbarge ordered a new trial because the plaintiff was denied the opportunity to develop his cross-examination and challenge testimony as a result of evidence first disclosed at trial. And the Fifth Circuit in the Rozier case ordered a new trial where prior disclosure of an unproduced document could have made a difference in the way plaintiff's counsel approached the case or prepared for trial. And when those cases in Rule 37 are applied here, this court must reverse and order a new trial because we and our experts took the position that there were no documents showing any rate negotiations or anything else approaching arm's length circumstances because that's what the evidence showed before trial. And since it wasn't produced in discovery, we were denied the opportunity to develop cross-examination regarding the term sheet and denied the opportunity to examine witnesses about the reliability and authenticity of this document when its metadata revealed that it was created in 2013, not 2005 as represented at trial. With this improper evidence that we had no ability to test, they were able to completely undermine our positions. And Tinbarge, Rozier, and Rule 37 say that was inherently unfair, prejudicial, and warrants a new trial. The second reason that this court should not allow the judgment to stand, Southwestern Did you object to all of the testimony about the term sheet that you're now saying should have been excluded? Your Honor, the first time that it was mentioned at trial, we objected and preserved our claim of error on appeal, and the court ruled that he was not going to admit the document, but he was going to allow testimony about it. And there was no requirement that we reobject or raise it again when the court had made his ruling. The next day, in the heat of trial, we tried again because we thought it was the right thing to do. And the court affirmed its ruling and made the same ruling it made the day before. And said he was going to allow testimony about the document. If there are no other questions on the term sheet, I want to move to the second reason why this court should not allow the judgment to stand. Southwestern's trial misconduct. The district court's refusal to instruct the jury that the court had approved of the class action procedure resulted in a miscarriage of justice where Southwestern argued to the lawyers, and not the court, appointed her to be the representative of a class that didn't agree with her and would be harmed if they ruled in her favor. Despite our request, the district court never instructed the jury that the court had determined Ms. Smith to be an adequate representative with interests the same as the class. Court never told the jury that the court approved of the class action procedure in this case. The court never instructed the jury that absent class members don't have to testify. Were those instructions requested? They were, your honor. We requested those. I will refer the court to Smith at 10229 through 30. That's our proposed instruction. And after the incident in closing, we requested that at Smith at 9372 through 76. And Southwestern's misconduct required that those instructions be given here. They argued that Ms. Smith's interests diverged from those of the class, as demonstrated by the fact that there was no evidence supporting her representation of the class. But the court allowed the jury to assume that other class members needed to testify to support Ms. Smith when Southwestern argued the class didn't agree with her positions and that ruling for her would hurt the class. And Southwestern knew these arguments were improper. The court motion in limine order prohibited them from suggesting at trial that any class member had any claim or were subject to any defense that was different from any of Smith's claims. They were under court order not to in any way drive a wedge between Ms. Smith and the class, and they completely disregarded that order. Southwestern also repeatedly attacked class counsel despite the district court's admonitions to stop, telling the jury that we were acting as antagonists to the class and had interests that diverged from the class. In any type of case, that kind of misconduct is out of bounds by all accounts. Gilster, Stallings, and the district court acknowledged that. But it was especially prejudicial here because the attacks on counsel drove a wedge between class counsel and the class in the eyes of the jury. And given Southwestern's misconduct, something had to be done. And we asked for an instruction consistent with what Newberg, Treatise on Class Actions, recommended be done, yet nothing was done. And there was a miscarriage of justice as a result. The district court knew how bad it had gotten before I even objected. And I will tell this court that there was no instruction that was going to put Ms. Smith and her counsel back together in the eyes of the jury, given Southwestern's misconduct. And the instruction given certainly didn't cure the prejudicial impact. They argued that Ms. Smith and her lawyers were both taking positions that would be good for them and would hurt the class. The court stated at the bench conference that the argument left him with that impression, that Ms. Smith was at odds with the class. And there is no doubt that it had the same impact on the jury, just as Southwestern intended. Yet the district court refused to instruct the jury that the court had approved of the class action procedure, that the court had approved of Ms. Smith as an adequate representative with the same interests as the class, and that absent class members don't have to testify. And given the curable- Did you argue those points? Excuse me, Your Honor? I did. We did in closing. Absolutely. Now, was there any objection to those arguments? I believe Southwestern's counsel stated that they did not believe that the court needed to give that detailed of an instruction. No, I meant, did you argue those points to the jury? The point is that it was the judge and not counsel that had approved the- No, Your Honor. Why not? You're saying counsel was arguing the contrary to the jury. Why didn't you respond and say, the judge approved this as a class action? Well, the judge refused to instruct- No, I get that. I understand that. I'm just asking why you didn't argue it. Well, I don't believe it was my place to tell the jury what the court had or hadn't done. There was a motion in limine granted that prohibited us from making any mention of any of the court's pretrial orders. And so it wasn't my place to tell the jury what the court had and had not found previously. It was the court's job to tell the jury that it had found that the class action procedure was appropriate and that Ms. Smith was an adequate representative to represent the class, especially in the face of Southwestern's attacks. And curable or not, the district court never gave those instructions. And given Southwestern's misconduct, it cannot be said that Ms. Smith and the class received a fair trial in their absence. If the court doesn't have any more questions on that point, I want to move to the third reason why this court should not allow the judgment to stand. And that's because the highly prejudicial third-party royalty practices of BHP were not relevant under the Tenth Circuit decision in Abraham, and Southwestern failed to lay any evidentiary foundation that could conceivably establish their relevance in any event. In Abraham, the Tenth Circuit ordered a new trial in circumstances almost identical to what we have here. Just like the party in Abraham used the royalty practices of third-party ConocoPhillips in that case, Southwestern repeatedly touted the royalty practices of third-party BHP in opening, closing, and through witness testimony as most illustrative on the key issue in the case, whether SECO's costs were reasonable. And the Tenth Circuit held that royalty practices of another producer, like those of BHP, are completely irrelevant, unfairly prejudicial, and inadmissible when answering least specific questions, and their admission is reversible, error-warning, and neutral. And we submit the court should follow Abraham and reach the same result here, especially because the improperly admitted evidence was much more prejudicial than that in Abraham, given the undeniable visual impact of Southwestern's cross-examination of Mrs. Smith. How can you say you were cheated by Southwestern when BHP deducted more? But even if the court's not convinced by Abraham, there was still no evidence presented laying any foundation that could have conceivably established the relevance of those royalty statements. And here's why. They presented no evidence establishing that the amounts that BHP deducted from Mrs. Smith's that BHP incurred for those services. There are no invoices from BHP from a gathering company. There's no contract between BHP and a gathering company. There is no lease between Mrs. Smith and BHP. And there was no testimony, no witness could testify why BHP deducted the amounts it did from Mrs. Smith's royalty checks, or how it calculated them. And the foundation problem is best illustrated by just supposing that BHP was allowed to deduct two times the cost incurred. The royalty statements, by themselves, are no indication of the cost incurred by BHP for those services. If the court doesn't have any questions on that point, I'm going to move this one. Is there a good place to read Judge Miller's reasoning on why he let that evidence in? I'm sorry, Judge Colleton? Is there a good place in the record where we can read the trial judge's reasoning on admitting that evidence? I don't know that the court gave a particularly detailed reason for allowing them, other than the court just allowed them. I mean, we filed a motion in limine before trial, specifically asking the court to exclude these. And we re-raised the objection at trial again. And the court admitted them. Was there a written order denying the motion? There is a written order denying the motion. The court's order on motion in limine is at Smith App 7086 through 89. You think that addressed this issue? It addressed our motion in limine on that point, Your Honor. Yes. I mean, the court's order on the motions in limine didn't give any particular reasons why the court granted or denied them. It was just a list of the motions in limine and said which ones were granted and which ones were denied. So it's not terribly helpful. I don't recall that the court specifically talked about why the court was allowing them at trial. I can go look at that while Mr. Street is up here. I assume somebody would have cited it, I guess, if it were helpful in the briefs. Does the court have any other questions on that point? If not, I'm going to move to the fourth reason why we believe this court should not allow the judgment to stand. And that's because the district court's rulings on novel questions of Arkansas state law were wrong as a matter of law and prejudicially tipped the scales in Southwestern's favor. And we submit that this court should certify those questions or follow the Trinity validity decision in Texas that we discussed in our briefs in reverse. The district court's rulings were erroneous and they weren't harmless. At summary judgment, the district court ruled that SECO incurred costs under the meaning of the lease regardless of whether SECO ever made any payment. But it refused to answer whether affiliate profit can be deducted. And with no ruling on instruction on whether affiliate profit can be deducted, the court's ruling on incurred was tantamount to the court's stamp of approval on Southwestern making royalty owners pay more for gathering and treating than Southwestern did. And even though all experts in the case agreed that a cost of service analysis like that that was performed by Ms. Smith's expert, Mr. Solomon, is an appropriate way to assess the reasonableness of affiliate transactions, the ruling allowed Southwestern to tell the jury to ignore his testimony because he looked at DeSoto's costs, not SECO's. He answered the wrong question is what they told the jury in closing. This harmful ruling was wrong as a matter of law. DeSoto's bills that were paid by another company, SES, SECO's marketing affiliate, are not costs incurred of SECO under the Trinity Valley decision. Unlike the Trinity Valley court, which held that post-production costs paid by a lessee's marketing affiliate are not costs incurred of the lessee, the district court here ruled that all of DeSoto's bills that were for over a decade paid by SES, SECO's marketing affiliate, were costs incurred of SECO. And to the extent- You're in your rebuttal time. You can continue if you like, or you can reserve some. On that note, then I will take a seat, Your Honor. I appreciate it. Mr. Street? May it please the court, Aaron Street on behalf of the Southwestern Companies. This was a vigorous, hard-fought, well-tried case. It was presided over carefully and conscientiously by Chief Judge Miller. The core issue in this case is whether SECO's incurred costs for gathering services provided by DeSoto were reasonable. That was the whole focus of this case. It was undisputed at trial, and it is still undisputed today, that DeSoto charged SECO less than it charged nearly all of its other gathering customers. SECO was 14th out of 17 on the gathering and treatment charges that it paid to DeSoto. This was not some sweetheart deal. In addition, when SECO went to find gathering services from other companies, it actually paid DeSoto a higher rate, a lower rate, than it paid other gathering companies. So this was not an example of SECO trying to garner additional deductions from the royalty payment. That's why the jury returned the verdict that it did. And most of the arguments that you've heard this morning are entirely tangential to that core reasonable issue that motivated the jury. So what I'll do, and of course nearly all of them are subject to highly deferential abuse of discretion review, or require a showing that there was a fundamental miscarriage of justice, that there was, quote, an overwhelming probability that the jury couldn't find a follow jury instructions that were given by Chief Judge Miller. So what I'll do, subject to the court's questions, is go point by point very quickly on the arguments that Mr. Kramer emphasized this morning. Mr. Kramer began with the term sheet, the 2005 term sheet. I want to be very clear. Mr. Kramer said that document was not produced. That is not accurate. The document was not produced during the discovery period. But both parties agree in their briefs that the document was produced 25 days before trial to Smith. They had that document. And in fact, it is clear from the record that they knew about that document because they objected to that document when it was placed on SECO's exhibit list. What was the reason for the delay? SECO was making productions in multiple cases. And SECO believed that it had produced that document in one of the other productions. And it found belatedly that it had not. And so it produced it. Smith objected to it before trial. It was well aware of the existence of the 2005 term sheet. And then at the opening in the trial and throughout the opening phases of the case, even though Smith had that information, it chose to make a central part of its argument that SECO and DeSoto were operating without any agreement in the early phases of the relationship. Even though they knew that 2005 term sheet, they chose to say there are questionable circumstances about how SECO and DeSoto were operating. When that evidence came up at trial, when the term sheet came up at trial, Smith did object. And Chief Judge Miller said, I'm going to exclude the term sheet because it was not timely produced. They got that relief. What would be the point of excluding the term sheet, but then allowing someone to testify, here's what was in the term sheet? I think if you read the record, what you see is the testimony was about those witnesses' personal knowledge about the term sheet. The term sheet itself was not produced to the jury. It was not admitted into evidence. But it's the same thing, isn't it? If you let somebody testify there was a term sheet, and here's what was in it from my personal knowledge, the same substance is coming in as though it were the term sheet itself, isn't it? What am I missing there? Well, the term sheet would, of course, verify for the jury, the accuracy of what those witnesses were saying. I mean, I think the law draws that distinction between the admission of evidence and the admission of personal knowledge. And Chief Judge Miller exercised his discretion because I believe he thought it would be in a disproportionate sanction for an inadvertent failure to produce. When they had the evidence before trial, it would have been disproportionate to prevent SECO from putting on their witnesses about these negotiations that were happening back in 2005, particularly when they had made that argument knowing that it was not accurate. I think Chief Judge Miller, who was on the ground at the trial, decided I'm not going to muzzle these witnesses talking about negotiations that they know about that resulted in the term sheet. And that sort of consideration of evidence that would otherwise be inadmissible is allowed by this court as a corrective to open, to correct misleading testimony proffered by the other side. Speaking of misleading, I'm curious about what your response would be to the assertion that the metadata shows that the document was created in 2013, not 2005. Yes, Your Honor. As I mentioned, we thought we had produced that document in this case, but we found that, in fact, we had it in another case. So what we did is we got that document, we scanned it in, and that's why it's shown as being produced in 2013. All right. So what you have is a scan created from an original that was in some other format before, and so the metadata is on the scan, not the original document. That's correct, Your Honor. Yes. Thank you. So unless there are any other questions on the term sheet, we think the judge reasonably exercised his discretion in creating the sanction that he did and in allowing SECO to put on testimony that rebutted misleading testimony from the other side. Now, the next category of arguments that Mr. Kramer has made relate to lawyer comments, not evidence. In particular, he references the complaint that SECO's counsel was allegedly trying to drive a wedge between Mrs. Smith and the class. There was only one instance where SECO made any such statement that had to do with suggesting that Ms. Smith didn't represent the class interest. That was in closing argument, and that was the only one that they objected to. And the second that Smith objected, I thought I brought it up here with me, but it's in our brief, Judge Miller gave a very detailed curative instruction, and he instructed them, remember, I've told you Ms. Smith represents the class. Any suggestion you've heard she does not represent the interest of the class, you should disregard that. That's block quoted in our appellees brief that responds to their argument on this point. What was the point of your argument? I can't go back and tell you the thinking of trial counsel on that point. I think that one thing I do know is that Ms. Smith was very honest throughout the course of her testimony that this was something where the lawyers had come to her and had said, you may have a claim here. She said, the lawyers were the ones who brought this to me. They were the ones who told me about this, and they were the ones who showed me how to bring this case. Now, there was evidence that what Ms. Smith was doing would hurt the other class members. That was not objected to. And in addition, that is different from saying she doesn't represent other class members and that sort of thing. That was simply making the point that the evidence in the record was when SECO created DeSoto to be its gathering company, it created efficiencies. It created savings that it passed on to the royalty owners. Because remember, if SECO had gone out and had to buy other gathering services, it would have had to pay a higher price. SECO was developing this field from scratch. It was the only one that could build these gathering facilities. So we were arguing, okay, if you make this argument that you cut out SECO and you treat everybody as the same company, you cut out DeSoto, you're going to harm the class members. That was just an argument about reasonableness at the end of the day. One quick final point on the term sheet. I think Mr. Kramer has presented that as being a central issue in the case and going critically to the issue of reasonableness. But the issue of reasonableness was just, are the rates reasonable? Are the rates DeSoto actually charges SECO comparable? Are they reasonable compared to the market? The question of how those rates came about is really a tangential issue. The jury could look at the end of the day and say, SECO is getting charged a low price by DeSoto relative to what DeSoto and other operators charge in that field. Would the BHP royalties be more relevant since that's a comparator? It certainly was relevant, Your Honor. It was one of 17 comparators that SECO put on. And that's why we have trouble understanding how BHP is not relevant. Let me elaborate on that a little bit. Ms. Smith received royalty checks from BHP. BHP operated a well that was just off Mrs. Smith's property. And Mrs. Smith was part of a unitized agreement whereby she got checks from BHP. And she saw how much BHP was charging for gathering, was passing on to her for gathering from its affiliate. So it's hard to imagine something. It's hard to see how that's irrelevant because it's somebody in the same oil field. It's somebody sending checks to the same plaintiff. But I want to emphasize that's not where the evidence stopped on reasonableness. Again, we had 17 other gathering companies producing, showing what their charges were to the producer. And so even if there was some error in admitting the BHP practices, that was just one line on an exhibit that was 17 lines long. The expert testimony, and let's just assume there's some problem with the admission of the BHP practices themselves, the BHP check stubs. There was no objection. There was no problem with SECO's experts saying, I looked at BHP along with a number of other gathering companies. And in doing that, I determined that SECO's costs were reasonably incurred. That's what SECO's experts did. So what's your response to the citation to the Abraham decision? And let me mention in response to both your question and Judge Colleton's earlier question that Chief Judge Miller did address these in a reasoned format in his order denying the motion for new trial. He addressed the Abraham case, and that's at Smith Appendix 10-764. So Abraham was simply a very different situation. Abraham was not about the reasonableness of charges. It was about whether the operator in that case was correctly paying the market value to the royalty holder. And the defendant in that case said, we want to bring in evidence about another producer, Conoco, which has all kinds of leases. And it just applies the government formula for determining what to be paid, what is to be paid to the royalty holder, whether it's a market value lease or anything else. So the Tenth Circuit and BP said, well, that's not relevant. They're not making a particularized determination as the market value. They're just applying some government formula as to all of their leases. It wasn't like what we have here where you had direct comparisons on the question of the reasonableness of the gathering costs that were being paid and being passed on to the royalty holders. So Judge Miller explains that. And I would say this is an example of where Chief Judge Miller was even-handed in the course of the trial. Ms. Smith wanted to introduce evidence of third party and how much the third party paid its gathering company.  A Southwestern, a SECO objected and said that's not relevant for a variety of reasons. And Judge Miller said, no, I'm going to let that in. That goes to the reasonableness of the charges. When we tried to bring up the BHP evidence, they made their relevance objection, similar argument in a lot of ways. Judge Miller said, no, I'm exercising my discretion to let all of that evidence in and let the jury decide what's reasonable. Now, they say that we have not laid a foundation for how it's relevant. Well, I think we've talked about that this morning. It was a producer in the same oil field, right next door to the plaintiff, paying fees to the plaintiff. If they had some argument about how it was not relevant, at that point, it was on them to show how this BHP evidence didn't cross the minimal relevance threshold. They never did that to Chief Judge Miller below. So if there are no further questions on those points, I will turn to the partial summary judgment and the motion to certify questions to the Arkansas Supreme Court. The partial summary judgment was correctly granted, and that was granted by Judge Wilson, who was the judge presiding over the earlier parts of the case. And I would suggest that all the court has to do is review Judge Wilson's order on the order granting the partial summary judgment. It was very straightforward. He said, what I have in the record is undisputed. I have got an agreement between SECO and DeSoto. Those are the only parties to that agreement, and the agreement is for DeSoto to provide gathering services to SECO. DeSoto provided those services, and SECO paid for those services by intercompany transfer. Those facts are undisputed. That is enough to grant summary judgment on the fact that SECO did incur some costs from DeSoto. It paid the costs. Now, the judge deferred the question of whether those costs were reasonable until trial, and that was the issue that was tried to the jury. Now, what Smith raises in her brief are really technicalities and formalities of who got the invoices when, did SECO walk over and hand a check to DeSoto by direct transfer? But remember, the agreement here said that the costs could be paid by intercompany transfer, and there's nothing unusual at all about that in the world of corporations with separate subsidiaries. So again, I think this all comes back to SECO and DeSoto had an agreement to get these gathering services. Really, undisputed other than technicalities, that SECO was out the money for those services, because what SECO did was it said it ordered SES to pay DeSoto, and then deduct those amounts when SES bought the gas from SECO. So that is SECO paying the bill. In addition, they focused a lot on the invoices, and again, I would just say go back and read Judge Wilson's order on that. He cites an undisputed declaration that says that SECO got these invoices from DeSoto. Now, there's also evidence saying that SES got them, and that's right. They both got them. But the only thing that was required, if anything, was required under the agreement was that SECO be one of the parties that get them, that they get the invoices. I would also say it's worth looking back at the trial record on the partial summary judgment point, too, because I think it confirms that this was a harmless error, even if we, of course, don't think it was an error granting the partial summary judgment. But even if it were in some way, I think it's worth looking at the testimony of the plaintiff's own experts. Both of their experts expressly concede that SECO incurred costs here when they paid DeSoto, and that's at Smith App 7845-46, Smith App 8392-93, and Smith App 8395-96. So in any event, they conceded those factual questions to the extent they weren't wrapped up by the motion for summary judgment. I'm turning briefly to the motion to certify questions, which I think was the last point that the plaintiff has raised here. They are arguing that the Arkansas Prudent Operator Statute somehow prohibits, without saying so expressly, the charging of affiliate costs and affiliate profits as part of the charge that's passed through to the royalty owners. There's no case that says that. The statute doesn't say that. But their argument is that the Arkansas Supreme Court would reach that conclusion. My key point on this, your honors, is that there's no basis for this court to certify that question to the Arkansas Supreme Court. The reason that a federal court certifies questions to a state court is so it can avoid answering those questions themselves. But the plaintiffs never ask this court to answer that question. They don't have any point of error in their merits brief that says SECO was precluded as a matter of Arkansas law from passing on these affiliate costs. And the reason they don't have that as a point in their merits brief because they didn't move for a judgment as a matter of law on that question. If they thought Arkansas law entitled them to judgment on passing on any element of profit to the royalty holders, they would have moved for judgment as a matter of law at the close of all the evidence. And then move for a new trial on that point. There's none of those filings below. And there's none of those filings. There's no point of error raised on that point in this court. So even if the court were to somehow certify this to the Arkansas Supreme Court, and they said, yeah, the Arkansas statute does prohibit passing on affiliate profit. It comes back here. There's no preserved point of error to do anything with it. So there's no basis to certify that. And the reason there is no legal ground on that point raised on the merits appeal is very simple. Once the class was certified, they abandoned their attempt to certify the question. And what they did was they treated the Arkansas prudent operator question as part of the breach of contract question. The Arkansas prudent operator is just an implied covenant that gets read into the contract. And they argued to the jury and they put on evidence during the trial that SECO had breached the Arkansas statute by acting unreasonably, by charging excessive costs, etc. So they treated that as a fact issue to be submitted to the jury. And in fact, they got a jury question, or they got a jury instruction that quoted the Arkansas prudent operator statute to the jury. And again, they did not move his judgment as a matter of law on any of those questions. And with that, I will ask the court to affirm the careful rulings of Judge Miller and the conscientious work of the jury in this case. Thank you, Mr. Street. Mr. Kramer, your rebuttal. Thank you, Your Honor. I want to address the term sheet first. They have no explanation whatsoever. For why it was not produced in discovery. And the fact that it was produced 25 days before trial, when there was a flurry of paper flying around, as this court is well aware, did not take away the prejudicial impact that that had on us at trial. Mr. Street said the negotiations weren't relevant. They were highly relevant. That's why the court allowed, that's why the court said he allowed testimony about it. And their own experts said the negotiations relating to the dedicated agreement were relevant. What about his claim that your side put on evidence suggesting there were no negotiations or something to that effect that was misleading? Well, Your Honor, it wasn't misleading because that is what the evidence showed before trial. Well, are you allowed, you know, go ahead. I mean, if I can address the question. I'm just saying, if the judge excluded something because it wasn't produced in discovery, does that allow you then to paint a picture that is not accurate? Because they can't get this exhibit in? Is the judge required to allow that to stand? Allow what to stand, Your Honor? I guess I don't understand what you're exactly asking. Well, you're saying because they didn't produce the document, you can put on evidence that there, as though there were no negotiations. Well, that's what the evidence was before we got to trial. All these witnesses. I'm not sure you understand what the question is. Here's the deal. Let's say that there's a term sheet or an agreement and it excluded by the judge because it was not produced in the discovery period. But it is produced before trial. At trial, you claim there were no negotiations and no agreements. Well, now this is an impeachment question. It is no longer a question about whether or not. I mean, it's a pretend universe in which you have a document that you know exists. And then you come in later and present evidence that says no such agreement exists. And then that's, you know, if you just think about it in trials. And I've tried more trials, I'm sure, than anybody in this courtroom. Judges always let that in, right? You can't, I mean, if it's excluded and you say we're not letting it in, all you can get is testimony about their knowledge, right? And then you kind of try and walk around the corner and say there were no agreements. No, no, no, no. The term sheet was not mentioned at trial until in Southwestern's case. We took the position in opening and our experts took the position in opening that there were no negotiations, no written evidence of any, because there weren't. That's my whole point. If you say, if you have evidence that negotiations and agreements existed, and then you take a position that none existed, then the other side can say they did in fact exist, right? Because that's an impeachment question. But your honor, the question itself recognizes the extreme prejudicial position that we were put in. Did you ask for a continuance on that basis? We did not, and we weren't required to, your honor. We, the very fact that we were supposed to accept the authenticity and legitimacy of this document that we got 25 days before trial. 25 days is a lifetime before trial. It's not. I've presided over 500 jury trials in my lifetime, right? And in 25 days, you certainly have enough time to figure out whether or not you need a continuance or not. Your honor, we had the testimony before trial. Their corporate representative told us that there was no term sheet. Their corporate representative on the new negotiations told us there was no term sheet prior to 2008. That's Mr. Bowling's testimony. But when the testimony, when the situation changes on the ground, right? And there is a document that tends to show that the reality is, is that there was a term sheet in an agreement. It is your position that you just get to try a case, divorce from the real facts? Well, no, the case should have been tried based on the facts that were disclosed in discovery. And expecting us to change our trial strategy based on a document whose authenticity, and we had no opportunity to test in discovery, was extremely prejudicial. Did you ask for a chance to, to redepose people? Did you ask for a chance to, to address it? I mean, well, let me address, let me address that point, your honor. Discovery was over, okay? And we never imagined that the court would allow this document in, or allow testimony about it in, especially considering that all the evidence in the case, and all the discovery in the case, proved that there was no 2005 term sheet at all. We spent two and a half years litigating this case, and our experts had already testified that they, and they would have gotten slaughtered if we would have changed our position. Rozier and Tinbarge say that's not allowed, and a new trial is warranted in these circumstances. It was extremely prejudicial, your honor. And if there's a new trial, is it going to be excluded then too? Well, what we will have is the opportunity to conduct a bunch of discovery about why this document, that they say was created in 2005, why its metadata shows that it was created in 2013. There's lots of discovery that we can do relating to that term sheets. For example, Mr. Bolling, why did he tell me there weren't any term sheets prior to 2008? Why did Mr. Thaler, the first witness that this document was used with, in his deposition led by Southwestern's counsel for an hour and a half, testified that there was no written document prior to 1-106 on rate negotiations at all? And so it's completely unfair for them to show up with a document that their own witnesses said didn't exist before trial and expect us to completely change our trial strategy. There's no doubt that production of this document during discovery would have changed our trial strategy, just like Tinbarge and just like Rozier. Mr. Cramer. Yes, your honor. Thank you. I think we've got your point. Court wishes to thank all counsel for your presence and the argument you provided to the court. The briefing that's been submitted will take the case under advisement. Thank you.